IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA        )
                                )    CIVIL ACTION NO. 10-0631-KD-N
v.                              )
                                )    CRIMINAL ACTION NO. 05-0345-KD
STEVE EUGENE RUSSO,             )
                                )
        Petitioner.             )

AMENDED[1] REPORT AND RECOMMENDATION

This matter comes before the court on the Motion of Steve Eugene Russo to Vacate, Set

Aside or Correct Sentence (doc. 567) pursuant to 28 U.S.C. § 2255.  The petition has been

referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c) for preparation

of a Report and Recommendation.  Oral argument was held before the undersigned on March 28,

2012, at which Michelle Nicrosi, Esq.,[2] argued on behalf of the petitioner, and AUSA Steven

Butler argued on behalf of the United States.  Upon consideration of the arguments of counsel, as

well as the pleadings and records in this case, including the Motion to Vacate (doc. 567), the

Response (doc. 573) and the Reply (doc.  575), it is hereby RECOMMENDED that the petition

be DENIED.

Procedural Background

On September 1, 2006, following a jury trial, petitioner was convicted on the following

counts: conspiracy to commit honest services fraud (Count 1); substantive honest services

---

[1] By order entered this day, a prior Report and Recommendation entered in this action (doc. 612) was withdrawn to allow correction of a clerical error.  The deadlines for the filing of objections, set forth hereinafter, supercede the prior deadlines set forth in the withdrawn document.

[2] As oral argument involved only issues of law, Russo waived his right to be present.  Docs. 610, 611.

violations arising out of American Hot (Counts 3-6, 8, 9); substantive honest services violations arising out of the sale of the Bankester lots (Counts 12-16, 18-21); substantive honest services violations arising out Russo's personal use of campaign funds (Counts 22-25); conspiracy to obstruct justice (Count 27); and obstruction of justice (Count 28).  On direct appeal, the Eleventh Circuit overturned Russo's convictions for honest services fraud based on his personal use of campaign funds, U.S. v. Wall, 285 Fed.Appx. 675, 681 (11th Cir. 2008)[3] (finding that such activities do not fall within the scope of the honest services statute, 18 U.S.C. §1346), but upheld his remaining convictions.

On June 24, 2010, the Supreme Court issued its decision in Skilling v. United States, 130 S.Ct. 2896, 2905 (2010), construing the honest services statute and holding, in sum, that the statute did not criminalize undisclosed conflicts of interest but rather covered only bribery and kickback schemes.  Id. at 2933.  Petitioner filed the instant motion within one year of that decision,[4] challenging his convictions for honest services fraud—but not for obstruction of justice, conspiracy to obstruct justice or forfeiture of assets—on the basis that the verdict may have been based on evidence, argument and instructions related to theories made impermissible by Skilling. (Doc. 567)  Specifically, petitioner argues that "[t]he Government in its prosecution relied upon theories of bribes and kickbacks, as well as theories of undisclosed conflicts of interest" and because "[t]he jury returned a general verdict [  ]it is therefore impossible to tell whether the jury relied upon the constitutional theories of honest service fraud, or the now unconstitutional theories."  Id. at p. 3.

---

[3] This case involved the consolidated appeals of Kenneth David Wall, Lawrence Peter Sutley and Steve Eugene Russo.

[4] The government acknowledges that the motion was timely filed.  Doc. 573 at 2.

The government opposes the motion on two grounds: first, that it is procedurally barred as Russo did not raise the Skilling issue at trial nor on direct appeal; and second, on the merits, asserting that the jury's verdict was not based on theories affected by Skilling.

Facts

The Eleventh Circuit's decision on petitioner's direct appeal[5] contains a concise recitation of the complex factual background of this case, which the court reproduces here.

> Russo served as the mayor of Orange Beach, Alabama (the "City"), from 1998 to 2006. As mayor, Russo was one of the six people who voted on development applications (the five others were the members of the city council). In order to gain approval for development applications from the City, four of the six voting members must vote for the project.
>
> Jim Brown ("Brown") was a successful local developer in the City who entered into an illicit relationship with Russo whereby Brown would provide things of value to Russo in return for Russo's support of Brown's development projects. The government originally charged Brown in the indictment with Russo, Sutley, and Wall. Brown pleaded guilty and cooperated with the Government as the chief witness against the Appellants.
>
> The alliance between Brown and Russo began in 2003. At that time, Brown did some work on Russo's house and when Russo offered to pay him, Brown declined, saying the mayor should consider it a campaign contribution. Instead of objecting, Russo asked Brown to screen in his porch. Over the next year, Brown tiled Russo's porch, repaired a roof and fence, installed a sprinkler system, landscaped the yard, added drainage lines, put in electric fans, and installed a generator. The total cost of these services was approximately $15,000, and Russo neither offered to pay nor paid Brown for any of his work.
>
> The record reveals that in the summer of 2004 Russo asked Brown to find "some way he could make some money." Russo told Brown that "he was tired of making money for all these people; he wanted to make some." Brown did not initially agree to help Russo, but Russo persisted, and Brown "was afraid to say no" because "he was the mayor and I had to have his support to continue to work." At this time, Brown had an option to purchase a house in neighboring West Beach that he planned to tear down, rebuild, and resell. Brown decided to let Russo

---

[5] U.S. v. Wall, 285 Fed.Appx. 675 (11th Cir. 2008)

3

become his partner on this project even though Brown "was going to be doing all the work and getting half the money."

A few days later, Russo called Brown and asked him to bring Sutley into the housing venture. To complete the venture, Sutley, Russo, and Brown used a limited liability corporation entitled "American Hot."[6] American Hot borrowed $1.6 million to buy the West Beach property and pay for the construction of a new house. All three partners signed the note. However, Brown arranged for the loan and covered all the closing costs. Sutley contributed his share of the first mortgage payment and insurance, but Russo paid nothing. As the West Beach deal was coming together, Brown repeatedly talked to Russo about the ethical issues raised by the alliance, and asked that he speak with an ethics advisor. Russo and Sutley both told Brown that Sutley was working on getting a ethics letter, but Brown never received a letter.

In September 2004, Hurricane Ivan destroyed the existing West Beach house. As a result, each partner received approximately $93,000 in insurance proceeds.

In 2004, city councilman Jerry Davidson ("Davidson") considered challenging Russo for mayor. Davidson was already a member of the city council and a reliable anti-development vote. As such, Brown did not want Davidson to be elected mayor. Brown learned from Davidson's daughter that the councilman would forgo the race if he could sell his house and relocate. As a result, Brown offered to buy Davidson's house for $200,000 more that it was worth, and also agreed (per Davidson's demand) to buy another house in a neighboring town.

When Brown talked to Russo about the plan to buy Davidson's house, Russo was pleased but told Brown that he did not trust Davidson to keep his word. Russo thus made some calls to determine the election filing deadlines but, failing to get an answer, put Sutley on the case. Sutley phoned Brown, gave him the filing deadline, and told him not to close before the deadline passed. Ultimately, the plan worked, and Davidson left town without challenging Russo for mayor.

Shortly thereafter, the City awarded Brown a contract to clear hurricane-related debris. The contract included both a clean-up fee ($68,562) and a management fee ($115, 793). Brown did the clean-up, but the City managed the project. However, Brown still received the entire amount for both clean-up and management. The project manager for the clean-up site (a City employee) told Brown "what a great

---

[6]   [Original Footnote 1] "Sutley originally established American Hot in the name of his secretary, Dianne Brown, for one of his clients who ultimately did not use it. After Sutley, Brown, and Russo decided to use American Hot for their venture, Dianne Brown assigned her interest to Sutley, Brown, and Russo."

friend" he had in Russo. When Brown asked Russo about the contract, Russo said the money could help defray the cost of the "Davidson deal." Russo also asked Brown how much money Brown expected to make from the clean-up contract. Brown told Russo that he was going to make about $50,000 and asked Russo how he wanted to be paid. Russo told Brown that Brown did not need to pay him.

In spite of Russo telling Brown he did not need to pay him, Russo later called Brown and asked him for "10 of the 50" to help with a new car. Russo told Brown to make the check out to Crystal McDonald (Russo's girlfriend) so that "nobody would find it." Brown agreed because "it was the only way [he] was going to get out of there." Brown also agreed that the remaining $40,000 would go toward a new house he would build for Russo.

In the summer of 2004, Brown and Wall were working on a very large condominium/hotel project called the Water Club. The value of the project was expected to be around $300 million. Because of the size of the project, Brown expected opposition on the city council.[7] In the spring of 2005, Brown and Wall pitched the Water Club project to Merrill Land Company (a land development firm) and when asked about the required rezoning, Wall assured Merrill's representative that Brown "had City Hall in pretty good shape" and that they "could guarantee the zoning."[8] As part of the Water Club project, Wall and Brown needed to acquire a neighboring parcel of beachfront land. To get this property, they agreed to give the owners of the beachfront land a parcel on the outskirts of the Water Club, which they also agreed to develop. One condition of the land swap was the approval of the development on the non-waterfront property. Russo voted to approve the new development, and the land swap occurred.

Later in 2005, Russo learned of two waterfront lots that were for sale by Claudia Bankester for $900,000. Russo asked Brown to buy the property with him, and Brown agreed. Russo and Brown ultimately entered into an agreement to purchase the Bankester lots for $1.2 million. Brown agreed to put up the collateral and personally guarantee the full amount of the loan. Brown and Russo planned to then re-sell the lots and split the profits. Two weeks after signing the contract, Brown told Wall about the deal.

During this same time, Brown and Wall were partners with Keith Chunn and Don Chunn, who owned a company called Deck Investments. Under their arrangement, Wall and Brown brought real estate proposals to Deck Investments.

---

[7] [Original footnote 2] "A city councilwoman testified that the project was controversial. Brown testified that 'it was going to be hard' to get approval and that he was counting on Russo."

[8] [Original footnote 3] "A Merrill representative testified that he was surprised by Wall's guarantee because he had never heard of such a thing in his twenty-five years in the real estate business."

If the group agreed on a project, Deck would finance it, Brown would build it, and Wall would sell it. At the time of the contracting for the Bankester lots, Deck held 72 acres of landlocked property and was looking for contiguous waterfront property to provide access to the gulf. Realizing that the Bankester lots met Deck's needs, Brown and Wall agreed that Brown had to get out of the deal. Brown assigned his interest in the property to Russo and then asked Russo what profit he expected from the property. Russo said he wanted to make $400,000, and Deck ultimately agreed to pay Russo $1.6 million for the property. Wall did not tell the Chunns about the original sale of $1.2 million or that Brown was involved in that deal. Furthermore, after the $1.6 million sale, which netted Russo $400,000, Wall told Brown "to be sure the mayor knew who made the deal happen." Ten days before the $1.6 million sale, Brown and Wall filed their application for the Water Club project.

Also during the spring of 2005, Brown purchased a lot in a complex called "Romar Vista" for $1.6 million. At the time Brown purchased the lot, other Romar Vista developers were trying to get rezoning for a new condominium, but Brown's lot was not part of the plan. Brown asked Russo for his help with getting Brown's lot to be part of the rezoning plan. Russo called the project's lawyer and reported to Brown that his lot would be part of the rezoning and that he should not sell it to the developers for less than $2.2 million. On August 2, 2005, the council approved the Romar Vista rezoning, including Brown's lot. Thirty minutes before the vote, Brown signed a contract selling his lot to the other developers for $2.2 million. Brown agreed to give Russo a $75,000 management fee when the sale closed.

In addition to the $75,000, Brown also agreed in the fall of 2005 to build Russo a new house at cost (a $160,000 value for Russo). Russo bought the land for his house with the $400,000 he made off the Bankester lots deal and planned to finance the construction with the $40,000 remaining from the $50,000 profit Brown made on the hurricane cleanup, as well as the $75,000 management fee for Romar Vista. Before Brown could begin building the house, the Government indicted Brown, Sutley, Wall, and Russo.

The first superseding indictment against the Appellants, which was returned on March 31, 2006, sought forfeiture of the American Hot proceeds. That day, Sutley called Brown twice and told him to move the money out of the American Hot account. He told Brown that "the feds are trying to get the house" and the bank account and that "it was urgent" to get the money out "before the government got the money." Brown complied and directed the bank to transfer the proceeds in the American Hot account into a different account. Russo also called the bank and told the branch administrator that he would like to open a new account because he believed that his account was going to be frozen because of a new indictment. As a result, Russo transferred $95,179 (which included the $93,000 insurance proceeds from the waterfront house destroyed by Hurricane Ivan) into a new account in the name of Russo's girlfriend, Crystal McDonald.

Analysis

Petitioner maintains, in sum, that his conviction in 2006 for honest services fraud is invalid in light of the United States Supreme Court's ruling in Skilling in 2010, wherein the Court held that honest services fraud requires proof that the defendant(s) received a bribe or kickback, as otherwise section 1346 would be unconstitutionally vague.  In its charge to the jury at Russo's trial, the court defined honest services mail/wire fraud as "accepting a bribe, taking a kickback *or receiving personal benefit from an undisclosed conflict of interest*."  Doc. 467-2, p. 12-13 and 16 (emphasis added).  Skilling made clear that the honest services statute did not encompass undisclosed conflicts of interest.  Thus, in light of Skilling, the jury instructions the district judge delivered on honest services mail/wire fraud included both valid and invalid theories of guilt.   Russo failed to raise this issue at either trial or on direct appeal.[9]

Procedural Bar

The government first argues that Russo's Skilling claims are procedurally defaulted, as defendant did not raise the issues at trial or on direct appeal.  Russo argues that his Skilling claim is not procedurally barred because Skilling represented such a change in the prior law that his failure to raise such a claim prior to the Skilling decision is excusable, that is, that the prior state of the law was "cause" for the failure to raise the claim.

"Under the procedural default rule, 'a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred

---

[9]   Russo argues that he did raise a vagueness issue on direct appeal.  For the first time in his reply brief before the Eleventh Circuit, Russo argued that a conflict of interest prosecution without proof that he had violated state law would render the statute vague.  As noted by the government, doc. 573 at 3 n. 1, the failure to raise the issue in the trial court is an independent basis for procedural bar, and the further failure to argue that issue in his initial appellate brief would generally have precluded consideration of that issue on appeal.

from presenting that claim in a § 2255 proceeding.' " McKay v. U.S. 657 F.3d 1190, 1196 (11th Cir. 2011) *quoting* Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir.2004).  The procedural default rule "is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." Massaro v. United States, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

There are two exceptions to a procedural default:  (1) cause and actual prejudice, and (2) actual innocence. Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998) (explaining that if a defendant fails to raise a claim on direct review, "the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent' "); Jones v. United States, 153 F.3d 1305, 1307 (11th Cir. 1998)(A federal criminal defendant who fails to preserve a claim by objecting at trial or raising it on direct appeal is procedurally barred from raising the claim in a § 2255 motion, absent a showing of cause and prejudice or a fundamental miscarriage of justice.)  Thus, if a defendant fails to pursue an available claim[10] on direct appeal, he is barred from presenting the claim in a motion for § 2255 relief unless he can establish cause for the default and actual prejudice resulting from the alleged error. McKay, 657 F.3d at 1196 ("Under the cause and prejudice exception, a § 2255 movant can avoid application of the procedural default bar by showing cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error.") (internal quotation marks and alterations omitted).

---

[10] "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." Mills v. United States, 36 F.3d 1052, 1055 (11th Cir.1994).

Certain changes in the law applicable to an issue may constitute cause. "When the state of the law at the time ... did not offer a 'reasonable basis' upon which to challenge the jury instructions," a defendant may demonstrate cause for failing to raise the issue at trial or direct appeal. Reed v. Ross, 468 U.S. 1, 16-17 (1984). See Bousley, 532 U.S. at 622 ("[A] claim that is so novel that its legal basis is not reasonably available to counsel may constitute cause for a procedural default."). Thus, cause may be shown where the Supreme Court later issues a decision with retroactive effect " '[overturning] a longstanding and widespread practice to which [it] has not spoken, but which a near-unanimous body of lower court authority has expressly approved.' " Reed, 468 U.S. at 17 (quoting U.S. v. Johnson, 457 U.S. 537, 551 (1982)).[11]

In addition to showing cause, the movant must show actual prejudice. "Actual prejudice is more than just the possibility of prejudice." Ward v. Hall, 592 F3d 1144, 1179 (11th Circuit 2010). To show prejudice, he must show "not merely that the errors ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire

---

[11] There were numerous statutory and constitutional challenges to § 1346 prior to petitioner's direct appeal. See, e.g., United States v. Hasner, 340 F.3d 1261 (11th Cir. 2003) (challenge to Section 1346 vagueness); United States v. Rybicki, 354 F.3d 124, 142–43 (2d Cir.2003) ( en banc); United States v. Welch, 327 F.3d 1081, 1109 n. 29 (10th Cir.2003); United States v. Hasner, 340 F.3d 1261, 1268–69 (11th Cir.2003); United States v. Waymer, 55 F.3d 564, 568–69 (11th Cir.1995); United States v. Paradies, 98 F.3d 1266, 1282–83 (11th Cir.1996). The fact that these challenges were rejected by both the Eleventh Circuit and other appellate courts does not alter the outcome. That an argument appeared likely to fail is insufficient cause to excuse procedural default. Bousley, 523 U .S. at 623, 118 S.Ct. at 1611 ("futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.' ") (quoting Engle v. Isaac, 456 U.S. 107, 130 n. 35 (1982)). In his reply to the government's opposition, petitioner cites the court to Stayton v. United States, 766 F.Supp.2d 1260, 1266 (M.D.Ala.2011). Stayon held that Skilling was such a "clear break with the past" that it excuses the procedural default of petitioners whose appeals predate Skilling." Id. at 1267. Stayton, however, represents a minority view. The majority of courts to consider the issue of futility have held that Bousley bars a Skilling-based claim that was not raised on direct appeal. Ryan v. United States, 645 F.3d 913, 916 (7th Cir.2011), rev'd on other grounds, 132 S.Ct. 2099 (2012); United States v. Lynch, 807 F.Supp.2d 224, 230 (E.D.Pa.2011); United States v. Jennings, 2011 WL 3609298 at *3 (D.Minn.Aug.15, 2011); United States v. Scruggs, 2011 WL 1832769 at *3 (N.D.Miss. May 13, 2011); Walker v. Rivera, 820 F.Supp.2d 709 (D.S.C.2011).

trial with error of constitutional dimensions." (emphasis in original). <u>United States v. Frady</u>, 456

U.S. 152, 170 (1982).

Notwithstanding the availability of these exceptions, the Eleventh Circuit has recognized

that they are narrow in scope and are to be applied sparingly:

> First, the Supreme Court and this Court repeatedly have emphasized that
> circumstances meriting the consideration of procedurally defaulted or barred
> constitutional claims are "extremely rare" and apply only in the "extraordinary
> case." <u>Schlup</u>, 513 U.S. at 324, 115 S.Ct. at 865 ("[A] substantial claim that
> constitutional error has caused the conviction of an innocent person is extremely
> rare."); *see* <u>House</u>, 547 U.S. at 538, 126 S.Ct. at 2077; <u>Johnson</u>, 256 F.3d at 1171
> (characterizing the actual innocence exception as "exceedingly narrow in scope").
> Indeed, the "very reason the miscarriage of justice exception was linked to a
> movant's actual innocence was to ensure" that the exception would remain
> "narrow, <u>McKay</u>, 657 F.3d at 1198, and apply only where "the individual
> interest in justice" outweighs "the societal interests in finality, comity [for state
> court judgments], and conservation of scarce judicial resources," <u>Schlup</u>, 513 U.S.
> at 324, 115 S.Ct. at 865. As we explained in <u>McKay</u>, the Supreme Court has
> cautioned the lower courts to "exercise restraint when determining whether to
> expand the exceptions to the procedural default rule." <u>McKay</u>, 657 F.3d at 1198;
> *see* <u>Dretke v. Haley</u>, 541 U.S. 386, 395, 124 S.Ct. 1847, 1853, 158 L.Ed.2d 659
> (2004) (explaining that expanding exceptions to procedural default rule "would
> have the unhappy effect of prolonging the pendency of federal habeas
> applications as each new exception is tested in the courts of appeals").

> <u>Rozzelle v. Secretary, Florida Dept. of Corrections</u> 672 F.3d 1000, 1015-16 (11th Cir.

2012)

Russo failed to raise the challenge presented in his habeas petition either at trial or on

direct appeal.  Accordingly, Russo's claim is procedurally defaulted *unless* he can meet one of

the two exceptions.[12]

_____

[12] "To establish actual innocence, the petitioner must demonstrate that, in light of all the
evidence, it is more likely than not that no reasonable juror would have convicted him." <u>Bousley</u>, 523
U.S. at 623(internal quotations omitted).  Russo does not claim "actual innocence" as an alternative
exception to procedural bar.  Nonetheless, as stated in <u>Fordham v. United States, 706 F.3d 1345 (11th Cir.
2013)</u>, a defendant who can not demonstrate prejudice by an entitlement to prevail on the merits also can
not establish "actual innocence" of the charges. <u>Fordham</u>, at 1349-50.

The Eleventh Circuit recently issued its decision in <u>Fordham v. United States</u>, 706 F.3d 1345 (11th Cir. 2013)[13], which addresses application of the cause and prejudice standard to <u>Skilling</u> claims.  The Court focused on the issue of prejudice from the alleged <u>Skilling</u> error, finding that because appellants were not entitled to relief on the merits—that their convictions were not based on the aspect of honest services fraud invalidated by the Supreme Court in <u>Skilling</u>—that they could not satisfy the prejudice portion of the cause and prejudice exception to procedural bar.

The same approach can be applied in this case.  The government challenges the "prejudice" prong of the cause and prejudice standard, as well as the "cause" prong.  Prejudice is shown if petitioner would prevail on the merits in the absence of the procedural bar, and not shown if he would not prevail.  <u>Fordham</u>, 706 F.3d at 1349-50.  In this case, as discussed in detail below, petitioner Russo has failed to demonstrate actual prejudice for the default because his claims fail on the merits.

<u>Applying *Skilling*</u>

At the close of the trial, the district judge instructed the jury that it could find the defendant Russo guilty of honest services wire/mail fraud on theories which violate <u>Skilling</u>, as well as on the core theories of bribery and kickback that remain viable after <u>Skilling</u>.  Consistent with case precedent at the time, the court charged the jury, in pertinent part:

---

[13] Petitioners John Fordham and Robin Williams brought separate habeas petitions pursuant to 28 U.S.C. § 2255.  The District Court denied each of their petitions on the grounds that their claims were procedurally defaulted without reaching the merits, but granted a certificate of appealability on the issue of whether the petitioners procedurally defaulted any Skilling-based claims for failing to challenge their convictions under Section 1346 at trial or on direct appeal.  The Eleventh Circuit consolidated the appeals.

To deprive another of the intangible right to honest services means to violate, or to cause a public official or employee to violate, the employee's or agent's duties to provide honest services to the public.

Public officials and public employee's [sic] inherently owe a duty to the public to act in the public's best interest. If, instead, the official acts or makes his decisions based on the official's own personal interests -- *such as accepting a bribe, taking a kickback, or receiving personal benefit from an undisclosed conflict of interest* -- the official has defrauded the public of the official's honest services even though the public agency involved may not suffer any monetary loss in the transaction.

And again, a kickback is defined the same way. It includes any kind of *undisclosed payment or reward to a public official* for dealing in the course of employment with the person making the payment so that the public official's personal financial interest interferes with the official's duty to secure the most favorable bargain for the employer -- or in this case the public.

Doc. 467 at 15-16; *see also* id. 13-14 (emphasis added)

*Law of the Case*

The government argues that defendant's claims concerning the America Hot counts are barred by the "law of the case doctrine" because, on direct appeal, the Eleventh Circuit stated that "the common sense construction" of those counts of the indictment was that Russo was charged because he took bribes. The Court's statement was made in response to defendant's grammatical argument that the American Hot portion of the indictment was flawed because it could be read as charging that Russo deprived the citizens of Orange Beach of their right to Russo's honest services as mayor "(1) by agreeing to take bribes from Brown, and (2) because Sutley agreed to take bribes from Brown." Wall, 285 Fed.Appx. at 680. The Court rejected Russo's argument as follows:

"[W]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction." United States v. Poirier, 321 F.3d 1024, 1029 (11th Cir. 2003). We conclude that the indictment is sufficient as to the American Hot counts because it clearly notified Russo of the offenses for which he was charged and set forth the elements of these offenses. The common

sense construction of the indictment is that the Government charged Russo because he took bribes. The Government did not base the indictment against Russo on the allegation that *Sutley* may have accepted bribes. Furthermore, as we have stated before, "[l]inguistic precision is not required" in an indictment. United States v. deVegter, 198 F.3d 1324, 1330 (11th Cir. 1999).

Id. at 680-81.

In the instant habeas proceeding, there is no dispute that the indictment includes *both* the undisclosed conflict of interest theory, which was invalidated in Skilling, and viable theories of bribery and kickback schemes, which were not affected by Skilling.  On direct appeal, the Court of Appeals was choosing between constructions that cast doubt on *who* was required to have committed the acts alleged in the indictment, not *what* the alleged acts were, and the answer was that "the common sense construction" showed the indictment charged Russo with violating the law *by his own actions*, rather than by his actions and/or those taken by Sutley.

Additionally, on the basis of coincidentally similar language, the government appears to confuse the test for sufficiency of the indictment with the test for harmless error to be used in addressing a Skilling claim.  Despite superficial similarity in the words used by the Court of Appeals, the issue to which the Court of Appeals spoke in Wall is sufficiently distinct from the harmless error argument raised herein by the government that there can be no preclusive effect between them.  Even were the undersigned to accept the government's 'law of the case' argument as to the meaning of the indictment, that determination would not settle the matter presented here. This court must look not only at the language of the indictment but also at the jury instructions and such factors as opening and closing arguments and the proof adduced at trial in order to determine, not whether the indictment was clear or what it meant, but whether this court may feel confident that the jury did not convict Russo on the invalidated conflict of interest theory despite the subsequently-invalidated jury instructions.

13

*Invited Error*

The government next argues that Russo's claims are barred by the invited error doctrine because he did not object to the jury instructions proposed at the close of the trial on <u>Skilling</u> grounds.  Doc. 573 at 18-19.  This argument is nearly indistinguishable in practice from procedural bar; indeed, courts have held that "[t]he invited error doctrine qualifies as a state procedural bar," <u>Druery v. Thaler</u>, 647 F.3d 535, 545-46 (5th Cir. 2011), and the same cause which would, in an appropriate case, excuse the failure to raise the issue before the appellate court may excuse the failure to raise the issue during the jury instruction conference.  <u>Id</u>.   As noted above, the court finds that the law prior to the issuance of the <u>Skilling</u> decision did not preclude Russo's lawyers from raising the issue and that petitioner has failed to show actual prejudice, and thus the procedural bar applies.[14]

*Prejudice & Harmless Error*

In addition to determining whether or not Russo can show prejudice, a consideration of the merits of Russo's claim is relevant to the issue of the harmlessness of the error claimed. The jury returned a general verdict. Russo argues, in sum, that the general verdict makes it impossible for the court to ascertain whether the jury found him guilty on the invalidated theory, requiring reversal.  The government argues in opposition that the error was harmless, specifically, that it did not affect the jury's verdict on any count.  Both parties agree that the proper standard to be applied in this habeas action is set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).  *See* doc. 567 at 23; doc. 573 at 19.

---

[14] The undersigned concludes that calling the defendant's failure to raise that argument "invited error" would not alter the result.  Accordingly, the court does not separately address this theory put forward by the government.

14

The government also cites <u>Hedgpeth v. Pulido</u>, 555 U.S. 57 (2008) (per curiam), in which the Supreme Court recently confirmed that an alternative-theory error—i.e., where a jury rendering a general verdict was instructed on alternative theories of guilt and may have relied on an invalid theory—is subject to harmless-error analysis on collateral attack "so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.' " <u>Id</u>. at 61 (alteration in original) (citation omitted).

> [T]he <u>Brecht</u> test for actual prejudice is whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623, 113 S.Ct. at 1714. "To show prejudice under <u>Brecht</u>, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." <u>Mansfield</u>,[15] 679 F.3d at 1313 (*quoting* <u>Mason v. Allen</u>, 605 F.3d 1114, 1123 (11th Cir. 2010)). To determine the effect on the verdict of a constitutional error, the Court must consider the error "in relation to all else that happened" at trial. <u>Kotteakos</u>,[16] 328 U.S. at 764, 66 S.Ct. at 1248. The question turns on whether the Court can "say, with fair assurance," that the verdict "was not substantially swayed by the error":
>
> > If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.
>
> <u>O'Neal</u>,[17] 513 U.S. at 437–38, 115 S.Ct. at 995 (*quoting* <u>Kotteakos</u>, 328 U.S. at 764–65, 66 S.Ct. at 1248) (brackets and ellipsis in <u>O'Neal</u> ) (emphasis omitted).

---

[15] <u>Mansfield v. Secretary, Dept. of Corrections</u>, 679 F.3d 1301 (11th Cir. 2012).

[16] <u>Kotteakos v. U.S.,</u> 328 U.S. 750, 66 S.Ct. 1239 (1946).

[17] <u>O'Neal v. McAninch,</u> 513 U.S. 432, 115 S.Ct. 992 (1995).

> The <u>Brecht</u> standard "does not require a showing that but for the error the jury would have rendered a verdict in favor of the defendant." <u>Duest v. Singletary</u>, 997 F.2d 1336, 1338 (11th Cir. 1993). Nor does it matter whether the reviewing court believes the petitioner is guilty, for the "crucial thing is the impact of the thing done wrong on the minds of [the jurors] ... in the total setting." <u>Id</u>. (*quoting* <u>Kotteakos</u>, 328 U.S. at 764, 66 S.Ct. at 1247–48). But although the <u>Brecht</u> harmless error analysis "is necessarily fact-specific and must be performed on a case-by-case basis, the erroneous admission of evidence is likely to be harmless under the <u>Brecht</u> standard where there is significant corroborating evidence, or where other evidence of guilt is overwhelming." <u>Mansfield</u>, 679 F.3d at 1313 (citations omitted).

<u>Trepal v. Secretary, Florida Dept. of Corrections</u>, 684 F.3d 1088, 1114 (11th Cir. 2012).

The relevant counts of the indictment contain language invalidated by <u>Skilling</u>.

Specifically, Counts 3-6, 8-9 [American Hot] charged that Russo and Sutley:

> knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to deprive the citizens of Orange Beach of their right to Russo's honest services as Mayor, including the right to conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self enrichment, self-dealing, concealment, bribery, fraud, and corruption, by corruptly receiving from Brown things of value, including money and interest in American Hot, LLC, a land venture pursued by Brown in which Russo and Sutley made little or no investment, in return for Russo's and Sutley's agreements to perform acts benefitting Brown and Wall.

Second Superseding Indictment (doc. 144 at 11).  Counts 12-16 and 18-21 [Land Flip] charged that Russo and Wall:

> knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to deprive the citizens of Orange Beach of their right to Russo's honest services as Mayor, including the right to conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self enrichment, self-dealing, concealment, bribery, fraud, and corruption by corruptly providing to Russo things of value, including profits from a land flip transaction arranged by Brown and Wall, in return for Russo's agreement to perform official acts benefitting Brown and Wall.

Second Superseding Indictment (doc. 144 at 13).  However, those counts also identified the manner of the violations in terms which clearly allege a bribery or kickback scheme.

In their briefs and at oral argument on the instant motion, the parties focused broadly on

16

"what the case was about" in terms of the government's intentions in bringing the charges. Russo points to reasonably extensive evidence offered by the government which showed his own non-disclosure of his relationship with Brown, Wall and other developers both in required filings and before votes on development projects, as well as Russo's failure to disclose his relationship with City Attorney Sutley prior to voting on Sutley's reappointment to that position. *See* doc. 328 at 57-69 (votes on Sutley contract, Romar Vista, and Romar Villas without disclosure of relationship); id. at 76-77 (uncharged developer who loaned Russo his New Orleans condo); doc. 228 at 54, 60-61, 68, 75-77, 117, 121 (testimony from Councilperson Joni Blalock on Mayor's duty to disclose, to abstain from votes in which he had conflict, and public's right to know of relationship and payments to Mayor Russo).  Counsel for the government argues that the evidence was offered as proof of concealment to bolster its claim of fraud and deceit.  Russo also points to excerpts from the government's opening and closing statements which suggest that Russo was guilty of undisclosed conflicts of interest.  *See e.g.*, doc. 467 at 3 (Government's opening: case is about public's right to demand officials not lie or use positions to enrich themselves); doc. 467-1 at 6 (Government's closing: "The duty to provide honest services is a duty to the public to put the public's interest first before your private interest, to not use your office for personal gain, to not exercise undue influence over people because of your public position, to not receive kickbacks and to not conceal your business interests."); id. at 10 ("The people of Orange Beach are entitled to know when their mayor and their city attorney are business partners with a developer who has projects before the City of Orange Beach.").

As the jury instructions contained both valid and invalid theories of guilt, the government

has the opportunity to demonstrate that a Yates error[18] was harmless. Skilling, 130 S.Ct. at 2934.

The issue is not what the government intended but rather the effect the flawed instructions—in

light of the indictment, the argument of counsel and most of all the evidence—had on the jury's

verdict.  Thus, even if the government properly could have made the same arguments and

adduced the same proof for purposes related solely to kickback and bribery theories and separate

and apart from the undisclosed conflict of interest theory, the issue before the court in addressing

harmlessness of the error concerns whether the jury returned its guilty verdicts on those counts

based on that invalidated theory, or whether they must necessarily have found Russo guilty of

honest services mail/wire fraud on valid theories of bribery and kickback.

In this case, unlike many of the reported cases which have addressed the harmlessness of

a Skilling error, see e.g., United States v. Siegelman, 640 F.3d 1159, 1173 (11th Cir. 2011)(error

harmless where jury convicted on bribery charge); Stayton v. U.S., 766 F.Supp.2d 1260, 1269

n.9 (M.D.Ala. Feb.28, 2011) (acquittal on bribery counts makes it unlikely that honest services

convictions based on bribery), the government did not bring parallel charges of bribery against

Russo.  Thus, the court may not rely on a conviction or acquittal on such a bribery charge to

guide its determination concerning the effect of the erroneous instruction on the verdict.

As noted above, because this issue is presented on collateral attack rather than direct

appeal, the court need not find the error harmless beyond a reasonable doubt, but by a finding

that it is fairly assured of its harmlessness.  See Kotteakos v. U.S., 328 U.S. 750, 765

(1946)(error is not harmless if court "cannot say, with fair assurance…that the judgment was not

substantially swayed by the error.").  "[T]he erroneous admission of evidence is likely to be

---

[18] Yates v. U.S., 354 U.S. 298 (1957) (constitutional error occurs when a jury is instructed on
alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory).

harmless under the <u>Brecht</u> standard where there is significant corroborating evidence, or where other evidence of guilt is overwhelming." <u>Mansfield</u>, 679 F.3d at 1313.  In this case, as set forth in the indictment, the proof of illicit payments and gifts to Mayor Russo by developers Brown and Wall, whom he was supposed to be regulating—rather than mere undisclosed business dealings with them—was overwhelming.  The jury would not have reached the issue of failure to disclose those illicit transactions unless it had found that such illicit transactions took place. *See* <u>Sorich v. U.S.</u>, --- F.3d ----, 2013 WL 692735 *3-4 (7th Cir. Feb. 27, 2013) (holding that where the evidence was so coextensive that the jury must have convicted defendant of both bribery and honest services fraud if it convicted on either one, any error was necessarily harmless). The inclusion of references to lying, cheating or failure to disclose is not sufficient on the record presented to make the court question that the jury found Russo guilty on the grounds of the proven bribes and kickbacks.  While the government did refer to Russo's failure to notify the Council or the public of those payoffs, *it is the payoffs themselves* which were central to Russo's convictions for honest services mail and wire fraud.  Indeed, the property interests that created an arguable conflict of interest which Russo failed to disclose were the principal payoffs he was given. *See* <u>United States v. Segal</u>, 644 F.3d  364, 366 (7th Cir. 2011)("[E]ven if the jury concluded that there was an honest services violation, that violation had to be premised on money/property fraud.  That is, to the extent Segal was depriving other of his honest services, it was because he was taking their money.")  The court is convinced that the other matters cited here by Russo did not distract the jury from that central focus.  Thus, the court can "say, with fair assurance," that the verdict "was not substantially swayed by [any <u>Skilling</u>] error" in the jury instructions and thus that the error was harmless.  Based on the foregoing, it is the recommendation of the undersigned that the petitioner's motion to vacate, set aside or correct

sentence be DENIED.

Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). Where a habeas petition is being denied, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows ... that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling[,]" Slack v. McDaniel, 529 U.S. 473, 484 (2000), and, in part, on the merits of an underlying constitutional claim, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" id.; see also id. at 483-484 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot v. Estelle,[19] includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues

---

[19] 463 U.S. 880 (1983).

presented were "'adequate to deserve encouragement to proceed further'"); *see* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further'").   The claims presented are not such that reasonable jurists could disagree with the proposed disposition and a Certificate of Appealability is thus due to be Denied.

<u>Conclusion</u>

For the foregoing reasons, it is hereby RECOMMENDED that the Motion to Vacate, Set Aside or Correct Sentence filed by STEVE EUGENCE RUSSO be DENIED as procedurally barred, and that it be denied, alternatively, on the merits.  It is further RECOMMENDED that any motion for Certificate of Appealability be DENIED.

**See Magistrate Judge's Explanation of Procedural Rights, attached, for important information on how to proceed.**

DONE this the 9<u>th </u>day of April, 2013.


/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

21

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. **Objection**. Any party who objects to this recommendation or anything in it must, within **fourteen (14) days** of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C.§ 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(en banc). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten [now fourteen] days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

(Emphasis added)  A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. §1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

/s/  Katherine P. Nelson